# United States Court of Appeals
## For the First Circuit

Nos. 20-1240, 20-1275, 20-1276, 20-1283, 20-1287, 21-1641

UNITED STATES OF AMERICA,

Appellee,

v.

LUIS DANIEL RAMOS-BAEZ, a/k/a Danny Power; EDUARDO
ROSARIO-ORANGEL, a/k/a Barba, a/k/a Cholon; AVELINO
MILLÁN-MACHUCA, a/k/a El Fuerte, a/k/a Viejo, a/k/a Gordo; LUIS
H. QUIÑONES-SANTIAGO, a/k/a Hiram; JUAN J. CLAUDIO-MORALES, t/n
Juan Jose Claudio-La Viera, a/k/a Claudio Canales, a/k/a Claudio
El Gordo; JOSÉ RAFAEL SANCHEZ-LAUREANO, a/k/a Veterano,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Timothy S. Hillman, U.S. District Judge]

Before

Barron, Chief Judge,
Thompson, Circuit Judge,
Burroughs, District Judge.*

Jose Luis Novas Debién, for appellant Luis Daniel Ramos-Baez.
Javier A. Morales-Ramos, for appellant Luis H.
Quiñones-Santiago.
Alejandra Bird Lopez, with whom Eric Alexander Vos, Federal
Public Defender, and Franco L. Pérez-Redondo, Assistant Federal
Public Defender, were on brief, for appellant Avelino
Millán-Machuca.

---

* Of the District of Massachusetts, sitting by designation.

Kendys Pimentel-Soto, with whom Kendys Pimentel-Soto Law Office LLC was on brief, for appellant Eduardo Rosario-Orangel.

Anita Hill Adames, for appellant Juan J. Claudio-Morales.

Tim Bower Rodriguez, with whom Tim Bower Rodriguez, P.A. was on brief, for appellant José Rafael Sanchez-Laureano.

Alexander Louis Alum, with whom W. Stephen Muldrow, United States Attorney, Mariana E. Bauzá-Almonte, Assistant United States Attorney, Chief, Appellate Division, and Francisco A. Besosa-Martínez, Assistant United States Attorney, were on brief, for appellee.

November 3, 2023

BARRON, **Chief Judge**.  These consolidated appeals are the latest to come to us in connection with a federal investigation of an organization -- referred to by the government as La Asociación ÑETA ("ÑETA") -- that operated throughout Puerto Rico's prisons and was allegedly involved in trafficking drugs and carrying out murders-for-hire.  In the wake of that investigation, each of the six appellants was convicted in the United States District Court for the District of Puerto Rico of conspiracy to violate the Racketeer Influenced and Corrupt Organization ("RICO") Act, see 18 U.S.C. § 1962(d), and conspiracy to possess with intent to distribute a controlled substance, see 21 U.S.C. § 846.  Each appellant now challenges those convictions.

Given the number of appellants, there are a broad range of challenges for us to address, although not all the appellants bring all of them.  The challenges target the sufficiency of the underlying indictment, the sufficiency of the evidence at trial to support the convictions, and a slew of claimed trial errors.  Two of the appellants also challenge the procedural reasonableness of their sentences.  But, although there is no shortage of challenges for us to address, we conclude that there is merit only to one challenge, which is brought by three of the appellants and takes aim at an asserted trial error.

In that challenge, the three appellants contend that hearsay statements by alleged coconspirators were admitted into

- 3 -

evidence at trial in violation of United States v. Petrozziello, 548 F.2d 20 (1st Cir. 1977). We conclude that this challenge requires a remand to the District Court because no finding was made below as to whether the statements at issue were made in furtherance of the alleged conspiracy. Moreover, our ruling in this regard leads us to reject the claim of cumulative error brought by Avelino Millán-Machuca, who is among the three appellants who advances the Petrozziello challenge, without prejudice to his raising the cumulative error challenge again in the wake of the ruling on the Petrozziello challenge on remand. We otherwise affirm all the rulings that are before us in these appeals.

## I.

The charges underlying the convictions were set forth in a sweeping indictment that named fifty defendants. The defendants were charged with various federal crimes that related to their alleged involvement with the entity that the indictment refers to as "ÑETA."

The indictment described ÑETA as a "criminal organization whose members and associates engaged in drug distribution and acts of violence, including murder." According to the indictment, the organization was originally founded by prisoners "in order to collectively advocate for the rights of" those in Puerto Rico prisons. But the indictment alleged that

this entity "[i]n time . . .evolved . . . [into] a criminal organization whose members numbered in the thousands."

Among the defendants named in the indictment are the six appellants: Millán-Machuca, Juan J. Claudio-Morales, Luis Daniel Ramos-Baez, Eduardo Rosario-Orangel, Luis H. Quiñones-Santiago, and José Rafael Sanchez-Laureano. Each was charged with two criminal counts.

The first count charged each of the appellants with RICO conspiracy in violation of 18 U.S.C. § 1962(d). In doing so, the count charged each appellant with conspiring to violate 18 U.S.C. § 1962(c), which makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c).

Section 1961(5) of the RICO statute defines a "pattern of racketeering activity . . . as two or more 'racketeering acts' that were related, occur within ten years of one another, and pose a threat of continued criminal activity." United States v. Millán-Machuca, 991 F.3d 7, 18 (1st Cir. 2021); see 18 U.S.C. § 1961(5). Qualifying "racketeering activity" includes "dealing in a controlled substance." See 18 U.S.C. § 1961(1). Two instances of the same type of racketeering "act" may satisfy the

- 5 -

definition of a pattern of racketeering activity. Millán-Machuca, 991 F.3d at 18 (citing United States v. Rodríguez-Torres, 939 F.3d 16, 29 (1st Cir. 2019)). As relevant to our analysis in these appeals, the indictment alleged that each appellant conspired to participate in the affairs of the entity described as ÑETA through a pattern of racketeering activity involving the trafficking of cocaine, heroin, and marijuana.

The second count charged each appellant under 21 U.S.C. § 846 with conspiracy to violate 21 U.S.C. § 841(a)(1). Section 841(a)(1) makes it "unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." This count alleged that the appellants engaged in a conspiracy to traffic over one kilogram of heroin, five kilograms of cocaine, and 100 kilograms of marijuana based on the same factual allegations that undergird the count that charges each of these appellants with RICO conspiracy.

Following a fourteen-day trial, the jury found each appellant guilty on both the RICO conspiracy charge and the federal drug-trafficking conspiracy charge. The District Court imposed concurrent prison sentences of at least 10 years on each of the

appellants for each of their convictions.  These timely appeals followed and were then consolidated.

## II.

We start our analysis with the challenges that take aim at the convictions based on an asserted problem with the indictment.  These challenges are brought solely by Quiñones-Santiago and concern only his RICO conspiracy conviction.

Quiñones-Santiago first contends in this regard that, in charging him with participating in the alleged RICO conspiracy, the indictment failed to identify an entity that qualifies as an "enterprise" within the meaning of 18 U.S.C. § 1961(4).  His argument proceeds as follows.

Section 1961(4) defines an "enterprise" to "include[] any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  The indictment defines the "enterprise" as:  "La Asociación Pro Derechos y Rehabilitación del Confinado, also known as La Asociación Pro Derechos de los Confinados, and La Asociación ÑETA (hereinafter referred to as La Asociación ÑETA or the 'enterprise'), including its leadership, membership, and associates."

Quiñones-Santiago asserts that, by defining the enterprise in this manner, the indictment defined it to be a "mixture of a small portion of the Ñetas (those indicted which

constitute a subset of the Ñetas), . . . the Ñetas (the 5,000 plus membership)[,]" and two corporate entities, "the Asociación Pro Derechos y Rehabilitación del Confinado, Inc., and the Asociación Pro Derechos del Confinado, Inc." He contends that such an entity cannot qualify as an "enterprise" because, as a matter of law, an "enterprise" cannot be the product of such a mixture.

Quiñones-Santiago does not appear to have moved under Federal Rule of Criminal Procedure 12(b)(3) to dismiss the indictment on this basis. But, even if we were to treat the challenge as preserved, it would fail on de novo review given the limited nature of the arguments that Quiñones-Santiago makes.

The text of § 1961(4) is written in expansive terms, as it provides that an "'enterprise' <u>includes</u> any individual, partnership, corporation, association, or other legal entity, <u>and</u> any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4) (emphasis added). Moreover, the Supreme Court of the United States has explained that, because § 1961(4) "does not purport to set out an exhaustive definition of the term 'enterprise,'" it "does not foreclose the possibility that the term might include, in addition to the specifically enumerated entities, others that fall within the ordinary meaning of the term 'enterprise.'" <u>Boyle</u> v. <u>United States</u>, 556 U.S. 938, 944 n.2 (2009); <u>see also</u> <u>United States</u> v. <u>Cianci</u>, 378 F.3d 71, 79 (1st Cir. 2004) ("The term's flexibility is denoted by the use of

- 8 -

the word 'includes' rather than 'means' or 'is limited to'; it does not purport to be exhaustive."). And yet, Quiñones-Santiago merely asserts in conclusory fashion that an organization that represents the "mixture" at issue here cannot qualify as an "enterprise." Accordingly, we conclude that the challenge is too undeveloped to succeed. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

Quiñones-Santiago also contends that the indictment does not allege facts sufficient to allege the crime of RICO conspiracy for a separate reason. Here he attributes the problem to what he argues is the indictment's failure to allege, as the Supreme Court has held is required for an indictment to allege the crime of RICO conspiracy, "the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." See Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 161 (2001). Rather, he argues, the indictment "improperly mixes the 'enterprise' with the 'person.'"

To support this contention, Quiñones-Santiago points to the section of the indictment, labeled "Background of the Enterprise (La Asociación ÑETA)," that provides: "La Asociación ÑETA introduced and distributed multi-kilograms of cocaine,

- 9 -

marijuana, and heroin into the prison system of the [Puerto Rico Department of Corrections and Rehabilitation ("PRDCR")] for profit." He then contends that "[t]he way the [i]ndictment reads . . . turns said 'enterprise' ipso facto into a defendant, into the liable actor who was engaged in drug trafficking."

Once again, we may assume that the challenge is preserved because we conclude that it, too, fails even on de novo review. The indictment plainly alleges that the "persons" are the individual natural persons who allegedly participated in the charged conspiracy, see King, 533 U.S. at 162-63, which is a group that includes Quiñones-Santiago and the other appellants. By contrast, the indictment plainly alleges that the "enterprise" is the entity that the indictment refers to as "ÑETA," which is alleged to be an "ongoing organization" whose members "associated together for a common purpose of engaging in a course of conduct," United States v. Turkette, 452 U.S. 576, 583 (1981). Thus, here, too, we conclude that there is no merit to the challenge, as the indictment makes clear that each "person" charged with the RICO conspiracy offense must be shown to have joined in the conspiracy to conduct the affairs of the alleged enterprise, which is the entity the indictment refers to as ÑETA.

## III.

The next group of challenges that we address focuses on the evidence at trial rather than the indictment and concerns

whether that evidence suffices to support the convictions.  The government asserts that several of the specific sufficiency challenges in this group of challenges were waived below.  We may assume otherwise because we conclude that, even on de novo review, all the sufficiency-of-the-evidence challenges fail.

**A.**

In reviewing the sufficiency of the evidence de novo, we ask whether a rational juror "could find that the government proved all the elements of the offense beyond a reasonable doubt." United States v. Fuentes-Lopez, 994 F.3d 66, 71 (1st Cir. 2021).  "To uphold a conviction, the court need not believe that no verdict other than a guilty verdict could sensibly be reached but must only satisfy itself that the guilty verdict finds support in a plausible rendition of the record." Id. (quoting United States v. Sabean, 885 F.3d 27, 46 (1st Cir. 2018)).

We must draw "all reasonable inferences from the evidence in favor of the verdict," United States v. Oliver, 19 F.4th 512, 519 (1st Cir. 2021) (citing Fuentes-Lopez, 994 F.3d at 71), but reject "evidentiary interpretations and illations that are unreasonable, insupportable, or overly speculative," United States v. Rodríguez-Martinez, 778 F.3d 367, 371 (1st Cir. 2015) (quoting United States v. Spinney, 65 F.3d 231, 234 (1st Cir. 1995)).  We may uphold a conviction against a sufficiency challenge on the basis of circumstantial evidence, though we "may not pursue

- 11 -

a 'divide and conquer' strategy in considering whether the circumstantial evidence [in the record] adds up . . . ." United States v. Guzman-Ortiz, 975 F.3d 43, 55 (1st Cir. 2020). At the same time, we may not "stack inference upon inference in order to uphold the jury's verdict." Id. (quoting United States v. Valerio, 48 F.3d 58, 64 (1st Cir. 1995)).

**B.**

We begin with the challenges that concern whether the evidence suffices to support the RICO conspiracy convictions. After laying out the elements of the offense, we then consider the individual challenges that pertain to these elements.

**1.**

"To prove a defendant's participation in a RICO conspiracy, the government must prove that 'the defendant knew about and agreed to facilitate' a substantive RICO offense . . . ." Millán-Machuca, 991 F.3d at 18 (quoting United States v. Leoner-Aguirre, 939 F.3d 310, 316 (1st Cir. 2019)). The substantive RICO offense here is set forth in 18 U.S.C. § 1962(c), which, as noted above, makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

- 12 -

The indictment alleged that the appellants were members of the enterprise. It further alleged that they conspired to conduct or participate in the enterprise's affairs through "a pattern of racketeering activity consisting of," among other things, "multiple offenses involving . . . [d]rug trafficking."[1]

To prove a defendant committed the offense of RICO conspiracy, the government need not "prove that the defendant himself committed or agreed to commit two or more racketeering acts." Millán-Machuca, 991 F.3d at 18 (citing Salinas v. United States, 522 U.S. 52, 65 (1997)). The government need prove only that "the defendant agreed that at least two acts of racketeering would be committed in furtherance of the conspiracy." Id. (citing Leoner-Aguirre, 939 F.3d at 317).

**2.**

We start with Quiñones-Santiago's contention that the evidence does not suffice to show that the charged conspiracy involved a qualifying "enterprise." Building on the indictment-focused challenge to his RICO conspiracy conviction that we rejected above, Quiñones-Santiago contends that the evidence in the record establishes that the entity that the indictment refers

---

[1] The indictment also alleged that some members of ÑETA engaged in two other types of racketeering activity: murder and bribery. However, on appeal, the government does not defend the appellants' convictions based on evidence relevant to murder or bribery.

to as "ÑETA" is a mixture of individuals, corporate entities, and a non-corporate entity. He then contends that such an entity cannot, as a matter of law, qualify as an "enterprise" under § 1961(4) for the same reasons that he contended that the indictment was defective in describing the "enterprise" to be such a mixture.

But, as we explained above, neither the text of § 1961(4) nor the relevant precedent makes it evident that such a mixed entity cannot qualify as an "enterprise." And yet, once again Quiñones-Santiago merely asserts the contrary view in a conclusory manner without developing any supporting argument. Thus, this argument fails for lack of development just as we concluded his related indictment-focused challenge did. See Zannino, 895 F.2d at 17.

Quiñones-Santiago separately suggests that even if an entity comprised of a mixture of individuals, corporate entities, and a non-corporate entity could qualify as an "enterprise" under the RICO statute in some circumstances, the government failed to put forth sufficient evidence at trial to show that the entity to which the indictment refers as ÑETA so qualifies. That is so, he contends, because the evidence at trial does not suffice to show that the named entity in fact operated as a single cohesive group.

The record contains testimony, however, from persons who were supportably shown to be members of the alleged enterprise

stating that it was hierarchically organized with members, chapters, protocols, and a "maximum leadership" overseeing its operations across Puerto Rico correctional facilities. Moreover, while Quiñones-Santiago is correct that the evidence does not show that every member of that entity was engaged in criminal activity, "nothing in the statutory definition of enterprise requires that the enterprise be defined solely by a criminal purpose." Millán-Machuca, 991 F.3d at 20. Thus, because the evidence suffices to show that the claimed enterprise constituted "a group of individuals associated in fact although not a legal entity," 18 U.S.C. § 1961(4), this aspect of Quiñones-Santiago's sufficiency challenge also fails.

**3.**

We move on, then, to the other sufficiency challenges that also concern the "enterprise" element of the underlying RICO conspiracy offense. These challenges are brought by Ramos-Baez and Sanchez-Laureano, and they concern the jurisdictional component of the "enterprise" element, which requires the government to prove that the alleged "enterprise" had at least a "de minimis effect on interstate or foreign commerce." See Millán-Machuca, 991 F.3d at 18 (citing Rodríguez-Torres, 939 F.3d at 16).

Ramos-Baez and Sanchez-Laureano contend that the evidence does not suffice to show such an effect.

Ramos-Baez and Sanchez-Laureano do not dispute that "[t]he market for illegal drugs constitutes commerce over which the United States ha[s] jurisdiction." See id. at 20 n.4. They contend, however, that the sole support for finding the jurisdictional element satisfied is the testimony from the government's expert witness -- Puerto Rico Police Officer Eddie Vidal-Gil -- regarding the origins of the drugs that members of the enterprise trafficked on its behalf. Ramos-Baez and Sanchez-Laureano argue that this testimony does not suffice to show that those drugs originated outside of Puerto Rico because Officer Vidal-Gil did not testify to having knowledge regarding the origin of the specific drugs that were trafficked on behalf of the enterprise. They point out, for example, that Officer Vidal-Gil did not testify that he personally "examined the narcotics distributed by [the enterprise] and [found] that they appeared to have some distinguishing characteristic . . . he had observed coming from other countries in past cases."

The problem with this challenge is that Officer Vidal-Gil also testified, based on his more than thirty-one years of experience investigating drug trafficking, that cocaine and heroin were not produced in Puerto Rico at all and that marijuana was locally produced only in limited quantities. Based on that

- 16 -

testimony, a rational juror could conclude beyond a reasonable doubt that at least some of the drugs trafficked on behalf of the enterprise, given their quantities, came from outside Puerto Rico. Thus, a rational juror reasonably could draw the inference that the trafficking of those drugs had at least a de minimis impact on interstate commerce, such that the enterprise itself did. See Millán-Machuca, 991 F.3d at 20 n.4 (holding that substantially identical testimony from Officer Vidal-Gil "that cocaine and heroin are not produced in Puerto Rico . . . was enough to establish the slight effect on interstate or foreign commerce that is required for a RICO conviction"); Rodríguez-Torres, 939 F.3d at 27-28 (reaching the same conclusion based on similar testimony). Accordingly, we reject this ground for reversing Ramos-Baez's and Sanchez-Laureano's RICO conspiracy convictions.[2]

**4.**

Independent of the sufficiency challenges that focus on the "enterprise" element, we also are presented with challenges to

---

[2] We also reject Sanchez-Loreano's "alternative" argument that, under Federal Rule of Criminal Procedure 33, he is entitled to a new trial because "the weight of [Officer Vidal-Gil's] testimony preponderates against a finding that" ÑETA's drug trafficking had at least a de minimis impact on interstate commerce. In pressing this contention, Sanchez-Loreano emphasizes that Officer Vidal-Gil also testified that the topography of Puerto Rico was such that these controlled substances could not be produced there even though Officer Vidal-Gil acknowledged on cross-examination that he had no botanical training. But, as we have explained, Officer Vidal-Gil's testimony that two of the

whether the evidence suffices to show the existence of the "unified RICO conspiracy" involving the enterprise that the indictment describes. Millán-Machuca and Ramos-Baez bring these challenges.

As we noted above, the indictment alleged a RICO conspiracy to "conduct and participate, directly, and indirectly, in the conduct of the affairs of" ÑETA "through a pattern of racketeering activity consisting of multiple offenses involving . . . [d]rug trafficking, including cocaine, heroin, and marijuana in violation of . . . 21 U.S.C. §§ 841 and 846." Millán-Machuca and Ramos-Baez contend, however, that the evidence does not suffice to show that there was a "core" to the unitary conspiracy described in the indictment. Instead, they contend that the evidence shows, at most, that there were (as Millán-Machuca puts it) "innumerable drug-trafficking conspiracies" across dozens of correctional facilities whose "practices were long-standing and considered

---

controlled substances at issue here are not produced in Puerto Rico at all and one is produced only in limited qualities substantially supports the conclusion that at least some of the drugs ÑETA trafficked came from outside of Puerto Rico. Thus, even accepting that Officer Vidal-Gil's topographical testimony was, as Sanchez-Loreano contends, without foundation, we see no basis for concluding that the weight of the evidence preponderates so heavily against the jury's verdict that he is entitled to relief under Rule 33. See United States v. Simon, 12 F.4th 1, 56 (1st Cir. 2021) (explaining that "a new trial motion . . . based upon the weight of the evidence . . . should be granted sparingly and only when the evidence preponderates heavily against the jury's verdict or a miscarriage of justice otherwise looms").

unchangeable" and whose proceeds "remained in the control of chapter leaders."

"To determine if the evidence supports finding a single conspiracy (that is to say, a single general agreement)[,]" we look for "(1) a common goal, (2) interdependence among the participants, and (3) overlap among the participants." United States v. Portela, 167 F.3d 687, 695 (1st Cir. 1999). But, while this analysis of "'common goals,' 'interdependence,' and 'overlap' is useful for resolving challenges to the sufficiency of the evidence on appeal," we also have looked "to 'the totality of the evidence' in determining whether there is factual support for a finding of a single conspiracy." Id. at 696. In undertaking the analysis of what the record shows regarding the scope of the conspiracy, moreover, we must keep in mind both that "[t]he essence of a conspiracy is an agreement" among all of the coconspirators "to commit a crime" and that "[t]he law is clear that a tacit agreement" to undertake activities that contribute to the success of the overall criminal conspiracy "is sufficient." Id. at 695 (quotation omitted).

We conclude that the evidence does suffice to permit a rational juror to find beyond a reasonable doubt that the unified conspiracy described in the indictment existed. Testimony from individuals supportably shown to be members of the entity that the indictment referred to as ÑETA -- which is the "enterprise" whose

- 19 -

operations the conspiracy is alleged to have facilitated -- suffices to permit a rational juror to find that, during the period that the indictment specifies: (1) the entity was hierarchically organized with a "maximum leadership" that oversaw its operations across all of Puerto Rico's correctional facilities; (2) the maximum leadership appointed people it "trusted" to serve as chapter leaders for the entity at each facility; and (3) the chapter leaders were responsible, along with the chapter leaders' own associates, for conducting the affairs of the entity at the direction of the maximum leadership. Thus, the evidence suffices to show that the claimed enterprise was itself a cohesive organization that was operating at the scale alleged in the indictment.

The evidence further suffices to show that, during the period in question, the maximum leadership and chapter leaders of ÑETA engaged in trafficking drugs for profit to "[e]nrich the members and associates of" the entity as well as the entity itself. For example, the evidence supportably shows that the maximum leadership of ÑETA (1) supplied to each correctional facility's ÑETA chapter "fund drugs" or a "pot" of drugs to be sold by members of ÑETA at the facility; and (2) distributed drugs that ÑETA's maximum leadership purchased with their personal (non-ÑETA) resources in a correctional facility while "clos[ing] the doors"

to that facility so that no other drugs could be sold there until the maximum leadership's drugs had been sold.

In addition, there was testimony from individuals supportably shown to be members of the alleged enterprise that it had a system for smuggling drugs into correctional facilities through a network of affiliated "suppliers" outside of the prison system. There was also testimony from such individuals that this entity had established rules that governed the payment of "incentives" not only for the use of cellphones provided by that same entity but also for the privilege of introducing and selling a ÑETA member's own drugs within a correctional institution in Puerto Rico. And there was testimony from such individuals that supportably shows that sanctions would be imposed by leaders of the enterprise for breaking these rules.

Finally, individuals who were supportably shown to be members of ÑETA testified that some of the money generated by the drug trafficking just described would be allocated to chapter- and enterprise-wide leaders. And, the testimony from such individuals also supportably shows that these leaders of the enterprise would then invest the money in acquiring more drugs to be similarly trafficked and would also set aside a portion to pay for biannual events that ÑETA would throw for its members and their relatives.

Thus, we conclude that, at least when considered as a whole, the evidence suffices to show that the unified conspiracy

alleged existed. To be sure, for the evidence to suffice to show that Millán-Machuca and Ramos-Baez were guilty of the RICO conspiracy offense charged, the evidence also must suffice to show that they joined in that conspiracy. But, insofar as these appellants are contending that the evidence does not suffice to show that there was such a unified conspiracy for them to join, we cannot agree, given the evidence in the record that we have just described. See Portela, 167 F.3d at 695-96; Cianci, 378 F.3d at 90.

That is so, we add, notwithstanding Ramos-Baez's contention that, for purposes of the RICO conspiracy charge, no evidence suffices to show "interdependence or overlap." The testimony from individuals that the evidence supportably shows were members of ÑETA suffices to permit a rational juror to find that the maximum leadership oversaw the operation of the enterprise and received a share of the proceeds of the drug trafficking undertaken with the assistance, and under the auspices, of the enterprise. The testimony by individuals supportably shown to be members of ÑETA also suffices to show that details regarding ÑETA's drug-trafficking operations were routinely reported back to the maximum leadership. Thus, we cannot agree that the evidence fails to suffice to show the existence of interdependence and overlap among the charged conspiracy's participants. See Portela, 167 F.3d at 695-96 ("Establishing 'interdependence' among the

- 22 -

participants requires determining 'whether the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect of the scheme.' . . . The 'overlap' requirement can be satisfied by the pervasive involvement of a single 'core conspirator.'").

In concluding that the evidence suffices to show that the unified conspiracy alleged did exist, we emphasize that the government did not need to prove that "a given member knows all his fellow coconspirators." Id. at 696 (citation omitted). Nor does the "fact that every defendant did not participate in every transaction necessary to fulfill the aim of their agreement . . . transform a continuing plan into multiple conspiracies." Id. (citing United States. v. Drougas, 748 F.2d 8, 17 (1st Cir. 1984)). For, "[w]henever a conspiracy involves successive transactions and multiple players, it is usually possible to slice the enterprise into discrete portions," as "[e]ven a single conspiracy is likely to involve subsidiary agreements relating to different individuals and transactions. And more often than not, none of the agreements is explicit; agreement is inferred from conduct." United States v. Twitty, 72 F.3d 228, 231 (1st Cir. 1995).

### 5.

The remaining sufficiency challenges to the RICO conspiracy convictions are bought by Millán-Machuca, Claudio-Morales, Ramos-Baez, and Rosario-Orangel. Each of these

appellants contends that the evidence fails to show that he personally engaged in conduct that would suffice to permit a jury to find that he joined in the unified conspiracy charged, even accepting that the evidence suffices to show that this unified conspiracy existed. For the reasons that we will next explain, we conclude that there is no merit to any of these challenges.

**a.**

We begin with Millán-Machuca's contention that his RICO conspiracy conviction must be reversed because the evidence suffices to show only that he "fail[ed] to stop an unstoppable tidal wave of drug-trafficking that has long existed" and so fails to suffice to show that he "agreed to the overall objective of the RICO offense." He contends that the evidence, at most, shows that he "was a figurehead who was not in control of the nefarious activities of other members" and, in fact, demonstrates that he engaged in "efforts to extend the legitimate influence of" ÑETA.

But testimony from individuals, who the evidence suffices to show were members of the alleged enterprise, supportably shows that Millán-Machuca served as its maximum leader between 2012 and 2015. That testimony further supportably shows that, from that position, he appointed chapter leaders at various Puerto Rico prisons. Additional testimony supportably shows that he supervised the enterprise's business practices, including by reviewing reports regarding drug profits that chapter leaders

- 24 -

prepared for that entity's leadership.  Thus, a rational juror could find that Millán-Machuca was guilty of the RICO conspiracy offense charged.  See Millán-Machuca, 991 F.3d at 18 (citing Leoner-Aguirre, 939 F.3d at 317).

Millán-Machuca does counter that the evidence "did not show that [he] was personally enriched by the alleged RICO conspiracy whose alleged purpose was to enrich the maximum leadership" or that he "actively participated in, or controlled, the use of drug funds."  But the government did not have to prove either that each defendant committed or agreed to commit two or more such racketeering acts himself or that each defendant directly benefitted from these acts.  See Leoner-Aguirre, 939 F.3d at 317 (citing Salinas, 522 U.S. at 65).  It was required to prove only that each defendant "knew about and agreed to facilitate" the conspiracy to conduct ÑETA's affairs through the commission of at least two acts of racketeering.  See id. at 316-17; Millán-Machuca, 991 F.3d at 18.

**b.**

In Claudio-Morales's version of this personal-conduct-based sufficiency challenge, he contends that the evidence does not suffice to show that he agreed "(1) to participate in the conduct of the affairs of the enterprise[;] . . . (2) that he committed at least two racketeering acts; and (3) that there was a nexus between the enterprise and any alleged drug transaction to

- 25 -

which Claudio-Morales could have agreed to be committed." And that is so, he adds, because the evidence does not suffice to show that he was a maximum leader, a chapter leader, or a member of the enterprise's "structured hierarchy."

But an alleged coconspirator identified Claudio-Morales at trial as an enforcer for the maximum leadership of the enterprise. That witness also testified that Claudio-Morales personally intervened on the maximum leadership's behalf to settle disputes about debts between members of the enterprise and its maximum leadership with respect to drug transactions and that, in one instance, Claudio-Morales trafficked drugs on behalf of an enterprise member to settle such a dispute. See Portela, 167 F.3d at 695 ("That each defendant had an interest in furthering the distribution of [controlled substances] is also sufficient evidence that they shared a common goal with the other participants."). The evidence further supportably shows that Claudio-Morales instructed new members of the enterprise on how to manage and keep tabs on drug profits in accounting books prepared for the maximum leadership and that he collected the cellphone incentive payments that members of the enterprise paid to ÑETA for the use of the cellphones that had been smuggled into the prisons to facilitate drug trafficking.

Taken as a whole, this collection of evidence suffices to show that Claudio-Morales did agree to conspire to participate

in the conduct of the enterprise's affairs through a pattern of racketeering activity.  And that is so notwithstanding the fact that he did not have a formal leadership position in the alleged enterprise.

**c.**

We next address Ramos-Baez's similar challenge, in which he contends that the evidence does not suffice to show that he agreed to participate in the conduct of the enterprise's affairs, played a part in its management, or agreed that he or any other member of the enterprise would commit at least two qualifying racketeering acts.  At trial, however, an alleged coconspirator identified Ramos-Baez as a member of the enterprise who had served in leadership roles for the enterprise.  Those roles included being a member of the "Dialogue Committee" and being a chapter leader, a position from which he "had to report to the maximum leadership as to the [controlled] substances."  The evidence also supportably shows that, in the latter role, Ramos-Baez helped to maintain a relationship with prison staff on behalf of the enterprise, including by obtaining the aid of "corrupt" guards to smuggle in contraband.  See Portela, 167 F.3d at 695-96.  Thus, the evidence suffices to support a reasonable inference that Ramos-Baez agreed that at least two acts of drug trafficking would be committed as part of the conspiracy that he joined.  See Millán-Machuca, 991 F.3d at 18 (citing Leoner-Aguirre, 939 F.3d at 317).

**d.**

The final personal-conduct-based challenge is brought by Rosario-Orangel. He contends that his RICO conspiracy conviction must be reversed because the evidence does not suffice to show that he agreed "(a) to participate in the conduct of the affairs of the enterprise[;] and (b) that he or any other member of the enterprise would commit at least two racketeering acts; and (c) that there was a nexus between the enterprise and any alleged drug transaction" in which the evidence shows he was engaged.

The record shows, however, that a coconspirator identified Rosario-Orangel as a ÑETA member who served as "Leader Two" at a Puerto Rico correctional facility. The testimony further shows that Rosario-Orangel obtained drugs from a ÑETA prison "pot" to sell within the prison on behalf of the organization's leadership. And the record shows, finally, both that Rosario-Orangel was in contact with Millán-Machuca's drug supplier from outside of the Puerto Rico prison system and that Claudio-Morales coordinated meetings with that supplier about making drug-related transactions.

This body of evidence suffices to support a rational juror's inference that Rosario-Orangel joined the conspiracy

charged.  See Millán-Machuca, 991 F.3d at 19-20.  So, this challenge, too, fails.

## C.

We also have before us sufficiency challenges to the drug-conspiracy convictions for violating 21 U.S.C. §§ 846 and 841(a)(1).  These challenges are brought only by Millán-Machuca and Ramos-Baez.

## 1.

The indictment alleged that the appellants conspired to violate 21 U.S.C. § 841(a)(1), which makes it unlawful "to . . . possess with intent to . . . distribute . . . a controlled substance," and specifically that the appellants conspired to traffic more than one, five, and 100 kilograms of mixtures or substances containing heroin, cocaine, and marijuana respectively.  Thus, to sustain the convictions on these charges, the government was required "to prove (1) the existence of a conspiracy to possess heroin, cocaine, and/or marijuana with the intent to distribute it, and (2) that the defendant knowingly and willfully joined in that conspiracy."  See Millán-Machuca, 991 F.3d at 19.

## 2.

Millán-Machuca and Ramos-Baez first take aim at whether the evidence suffices to support finding that the single overarching drug-trafficking conspiracy charged in the indictment existed.  There is no merit to the challenge.

Individuals supportably shown to be members of the enterprise testified that the maximum leadership of the enterprise sought, on behalf of the enterprise, to require members to pay routine "incentive" fees to the chapter leadership to engage in "personal" drug trafficking. As we explained above, the evidence further shows that the maximum leadership and chapter leaders worked, on behalf of the enterprise, to smuggle cellular phones into correctional facilities for the purpose of conducting drug-trafficking operations in a coordinated way and that the leaders charged prisoners a monthly fee known as an "incentive" for the use of those cellphones in furtherance of drug trafficking. The evidence supportably shows, too, that chapter leaders across the organization collected drug trafficking incentive fees and reported on drug sales and incentive fees to the maximum leadership on a monthly basis.

Millán-Machuca and Ramos-Baez do argue that "[n]othing showed that 'personal drug' activities financially [benefited]" the overall enterprise or the maximum leadership because the chapters functioned autonomously, such that "those 'incentives' remained with the chapter." But there is testimony in the record from individuals supportably shown to be ÑETA members that flatly contradicts this assertion and that states instead that some of the proceeds of drug trafficking and some of the incentive payments were sent back to the organization's maximum leadership. Thus, to

the extent that Millán-Machuca and Ramos-Baez mean to argue that the evidence suffices to show only "innumerable drug-trafficking conspiracies" rather than a single one, we cannot agree.  See Twitty, 72 F.3d at 231.[3]

**3.**

Millán-Machuca and Ramos-Baez separately contend that the evidence does not suffice to prove beyond a reasonable doubt that they agreed to join the drug-trafficking conspiracy alleged in this count of the indictment, even if such a conspiracy otherwise existed.  We disagree.

With respect to Millán-Machuca, the same evidence that we described in rejecting his challenge to the sufficiency of the evidence for his RICO conspiracy conviction suffices to show that he served as a maximum leader of ÑETA and oversaw activities related to obtaining and using drug profits on ÑETA's behalf. Thus, the evidence suffices to show that he committed the drug-trafficking conspiracy offense charged.  See Portela, 167 F.3d at 695-96.

---

[3] Because we find that the evidence suffices to support both the RICO conspiracy charge and the drug-trafficking conspiracy charge as alleged in the indictment, we need not address Millán-Machuca's and Ramos-Baez's argument that there was a variance that was prejudicial.  See United States v. Mangual-Santiago, 562 F.3d 411, 421 (1st Cir. 2009) (explaining that a variance occurs when "the evidence adduced at trial proves different facts than those alleged in the indictment" (quoting United States v. Yelaun, 541 F.3d 415, 419 (1st Cir. 2008))).

With respect to Ramos-Baez, the evidence suffices to show -- as he acknowledges -- that he obtained drugs from an outside supplier and sold them throughout the Puerto Rico prison system. He does contend, we recognize, that the evidence of his drug dealing could merely show that he was trafficking his own personal drugs and thus cannot suffice to show that he is guilty of the alleged drug-trafficking conspiracy. But an alleged coconspirator testified that Ramos-Baez paid incentives to the leadership of the enterprise, which enabled Ramos-Baez to traffic his personal drugs within the correctional facilities, and that some of the profits from that drug dealing went to the enterprise. That evidence supports a reasonable inference that Ramos-Baez agreed to join the drug-trafficking conspiracy charged and not that he merely trafficked drugs with others independent of the trafficking conspiracy described in the indictment.

Millán-Machuca and Ramos-Baez do point out that not all the testimony regarding their selling of drugs expressly linked their personal drug sales to ÑETA. But substantial testimony supportably shows that Millán-Machuca and Ramos-Baez helped to coordinate and even lead ÑETA's activities, including with respect to activities that supported ÑETA's drug-trafficking operations, as we have described above. See Millán-Machuca, 991 F.3d at 19-20 (testimony that defendant helped "in overseeing the organization's drug trafficking operations" sufficed to support

conviction under 21 U.S.C. § 846).  Thus, a rational juror could find on this record that these appellants are guilty of participating in the drug-trafficking conspiracy alleged in the indictment.[4]

**IV.**

To this point, we have found no basis for deeming the indictment defective or for reversing any of the convictions on sufficiency-of-the-evidence grounds.  What remains to be considered are the appellants' various claims that their convictions must be vacated due to trial errors.

Given the number of appellants and the number of distinct challenges of this kind that are before us, there is considerable ground to cover.  We first address the challenges, brought by Millán-Machuca and Rosario-Orangel, that are based on the government's asserted failure, at times, to comply with its various requirements to disclose evidence to the defense in advance of trial.  Then we take up Quiñones-Santiago's challenge to the

---

[4] Millán-Machuca also contends that the testimony from a cooperating witness, Orlando Ruiz-Acevedo, "connecting [Millán-Machuca] to a handful of specific drug-trafficking transactions" is insufficient support for his conviction of drug conspiracy in the quantities contained in the jury verdict. However, the quantities listed in that form pertain to the amount of heroin, cocaine, and marijuana that "the conspiracy involve[d]" (emphasis added).  And Millán-Machuca develops no argument on appeal either that ÑETA collectively did not traffic those quantities of drugs or that, even if it did, it was not foreseeable to him that drugs would be trafficked in those quantities. C.f. United States v. Pizarro, 772 F.3d 284, 292 (1st Cir. 2014).

government's assertedly improper statements during closing. After that, we consider challenges by Millán-Machuca and Ramos-Baez to the District Court's jury instructions. Finally, we address various challenges to the District Court's evidentiary rulings during trial.

As we will explain, we conclude that only one of these challenges -- the one brought by Millán-Machuca, Rosario-Orangel, and Quiñones-Santiago -- warrants a limited remand to the District Court. That challenge concerns whether coconspirator statements were admitted in violation of Petrozziello. Otherwise, we conclude that the challenges are without merit, though we do also conclude that our ruling on the Petrozziello issue precludes us from definitively resolving at this juncture Millán-Machuca's claim of cumulative error.

**A.**

Starting with the disclosure-based challenges, we first consider the ones that concern asserted violations of the government's obligations to disclose evidence to the defense in advance of trial under the Jencks Act, Brady v. Maryland, 373 U.S. 83 (1972), and Giglio v. United States, 405 U.S. 150 (1972). These challenges are brought by Millán-Machuca and Rosario-Orangel. We will start with the challenges that Millán-Machuca brings. But, before diving into the merits, we first provide the relevant legal background.

**1.**

Brady and Giglio establish that "[a] defendant's right to due process [under the Fifth Amendment to the U.S. Constitution] is violated when the prosecution suppresses evidence that is both favorable to the accused and material either to guilt or innocence." United States v. Raymundí-Hernandez, 984 F.3d 127, 159 (1st Cir. 2020) (quoting Moreno-Morales v. United States, 334 F.3d 140, 145 (1st Cir. 2003)). To succeed on a Brady or Giglio claim, the defendant must make three showings: First, that the evidence at issue is favorable to him because it is exculpatory, see Brady, 373 U.S. at 88, or because it is impeaching of a government witness, see Giglio, 405 U.S. at 154; second, that the government suppressed the evidence either willfully or inadvertently, Raymundí-Hernández, 984 F.3d at 159-60; and, finally, that prejudice ensued, id. The prejudice analysis reduces to whether, in the absence of the suppressed evidence, the defendant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Id. at 160 (quoting Kyles v. Whitley, 514 U.S. 419, 434 (1995)).

The "impeachment evidence" that must be disclosed under Giglio includes evidence of any prior statements by a witness that are inconsistent with the testimony that the witness gives at trial. See United States v. Meserve, 271 F.3d 314, 320 (1st Cir. 2001) (explaining that the credibility of a witness "may be

- 35 -

impeached by asking him about prior inconsistent statements" (citing Fed. R. Evid. 613(a) and United States v. Hudson, 970 F.2d 948, 953-54 (1st Cir. 1992))). A prior statement is "inconsistent" if it is "irreconcilably at odds" with the one made at trial. Id. (quoting United States v. Winchenbach, 197 F.3d 548, 558 (1st Cir. 1999)). Thus, "[p]rior statements . . . that omit details included in a witness's trial testimony are inconsistent if it would have been 'natural' for the witness to include the details in the earlier statement." Meserve, F.3d at 320-21 (quoting United States v. Stock, 948 F.2d 1299, 1301 (D.C. Cir. 1991)).

Whether the non-disclosure of impeachment evidence was prejudicial "turns on four factors . . . : Whether the impeachment evidence (1) is strong, (2) impeaches on a collateral issue, (3) is cumulative of other evidence on the record, and (4) the impeachable witness's substantive testimony is corroborated by other evidence in the record." United States v. Tucker, 61 F.4th 194, 207 (1st Cir. 2023). "The strength of impeachment evidence and the effect of suppression are evaluated in the context of the entire record to determine materiality." United States v. Paladin, 748 F.3d 438, 444 (1st Cir. 2014).

In addition to the government's due-process-based disclosure requirements under Brady and Giglio, the government also has a statutory disclosure obligation under the Jencks Act. That statute requires a district court, on motion of the defendant,

to order the government to produce "any statement" that "relates to the subject matter as to which the witness has testified." 18 U.S.C. § 3500(b).

Under the Jencks Act, a "statement" includes "a written statement made by said witness and signed or otherwise adopted or approved by him" or "a substantially verbatim" contemporaneous recording of his prior oral statement. Id. § 3500(e). Any substantially equivalent memorialization of a witness's statement may be producible under § 3500(e)(1) if the statement was read back to the witness and "adopted" by him. Campbell v. United States, 373 U.S. 487, 495-97 (1963).

If the government fails to produce such a "Jencks statement," the district court "shall strike" the witness's testimony. 18 U.S.C. § 3500(d). But, like Brady and Giglio, the Jencks Act does not provide grounds for relief on appeal "unless the exclusion [of the materials from disclosure] or failure to produce [them] prejudiced [the] defense." United States v. Nelson-Rodriguez, 319 F.3d 12, 35 (1st Cir. 2003).

We review preserved claims of error in Brady, Giglio, and Jencks Act "rulings for abuse of discretion, mindful that a material error of law invariably constitutes an abuse of discretion." United States v. Sepulveda-Hernandez, 752 F.3d 22, 33 (1st Cir. 2014) (internal citations omitted); see also Raymundí-Hernández 984 F.3d at 159.

**2.**

With that background in place, we start with the challenge under <u>Giglio</u> and the Jencks Act in which Millán-Machuca contends that the District Court abused its discretion by denying his motion to exclude testimony from a cooperating government witness and alleged coconspirator, Orlando Ruiz-Acevedo. The relevant facts and procedural history are as follows.

At trial, Millán-Machuca moved to exclude Ruiz-Acevedo's testimony based on the fact that notes that the Federal Bureau of Investigation (FBI) had taken during prior interviews of Ruiz-Acevedo -- and that came to light during Ruiz-Acevedo's testimony -- had not been disclosed. Millán-Machuca based his motion on the ground that these notes should have been disclosed pursuant to the Jencks Act. He also argued that any variance between Ruiz-Acevedo's trial testimony and his statements as recorded in the notes constituted impeachment material subject to disclosure under <u>Giglio</u>.

The District Court reviewed the notes in camera and then denied the objection to Ruiz-Acevedo's testimony on the following grounds:

> [W]hile the testimony adds inculpatory details . . . I know they are generally consistent with the criminal conduct, including the drug dealing set forth in the 302, so I decline to strike the testimony.

> . . . I agree with [counsel] that the remedy
> is the exclusion of the testimony, [but] I
> think that, under the circumstances of this
> case, that remedy exceeds the scope of the
> alleged . . . violations.

Following his convictions and sentence, Millán-Machuca filed his notice of appeal. But after filing his opening brief, though before the government filed its responsive brief, Millán-Machuca moved in our Court to file, under seal, both the notes from the interview with Ruiz-Acevedo and the transcript of the translation of those notes from the District Court's in camera review. We granted the motion.

Millán-Machuca argued in the motion, as he argues in his reply brief on appeal, that the notes and transcript show that there are significant differences between the testimony that Ruiz-Acevedo gave at trial and what he said during his pre-trial interview with law enforcement. He contends that these differences include: (1) that during his pre-trial interview, Ruiz-Acevedo described quantities of drugs trafficked by ÑETA that differed significantly from the quantities to which he testified at trial; and (2) that Ruiz-Acevedo spent time in "segregation" contrary to his description of his incarceration at trial. Millán-Machuca then goes on to argue that these differences reveal inconsistencies between Ruiz-Acevedo's trial testimony and what he said during the pre-trial interview with law enforcement, such that the government was obligated to disclose the notes prior to trial not only under

the Jencks Act but also as impeachment material under Giglio.  See Meserve, 271 F.3d at 320.

To show prejudice, Millán-Machuca asserts that the government's failure to disclose the notes "effectively hamstrung the defense, precluding it from investigating the statements and conducting a meaningful cross-examination" of Ruiz-Acevedo.[5]  He then further contends that the testimony that Ruiz-Acevedo gave was significant because Ruiz-Acevedo was the only witness to Millán-Machuca's personal involvement in drug trafficking.

There is force to Millán-Machuca's contention that the government was obliged, at least under Giglio, to disclose the notes in question.  But, even so, we conclude that this challenge fails on prejudice grounds.

The differences that Millán-Machuca highlights between what the notes indicate Ruiz-Acevedo said during his interview with law enforcement and his testimony at trial concern only whether the quantity of heroin that Ruiz-Acevedo said was trafficked by ÑETA through one prison in a given year was roughly

---

[5] Millán-Machuca argues in the alternative that we must at least remand for the District Court to conduct a further review of whether the evidence in question gave rise to disclosure obligations under the Jencks Act and Giglio.  See, e.g., United States v. Colón-Díaz, 521 F.3d 29, 39 (1st Cir. 2008) ("When confronted with uncertainties of this type in the past, we have sometimes remanded the case to the district court to clarify the record.").  We need not do so here because the record makes clear that Millán-Machuca was not prejudiced.

three or five kilograms, and Ruiz-Acevedo's own prison disciplinary history. Thus, the failure to disclose the notes prior to trial did not prevent Millán-Machuca from exploring inconsistencies that were central either to the substance of Ruiz-Acevedo's testimony or to Ruiz-Acevedo's credibility. See Tucker, 61 F.4th at 207 (considering in a Giglio prejudice inquiry, among other factors, the strength and centrality of undisclosed impeachment evidence).

Moreover, independent of Ruiz-Acevedo's testimony, the government put forth substantial evidence of Millán-Machuca's guilt. That evidence took the form of recorded phone calls and testimony by three other coconspirators that, at least in combination, was more than sufficient to show that Millán-Machuca coordinated and led ÑETA's activities, including by overseeing its drug sales and profits, and that he supplied drugs for other ÑETA members to sell in prison. C.f. Giglio, 405 U.S. at 154-55 (reversing where the improperly suppressed impeachment evidence revealed a potential motive to provide false testimony for the one witness on whom "the [g]overnment's case depended almost entirely").

Finally, while Ruiz-Acevedo was the sole witness to testify that Millán-Machuca personally trafficked drugs, as we explained above, the government did not need to prove that Millán-Machuca personally engaged in any drug transactions of his own.

To establish the elements of the conspiracy offenses charged the government needed to prove only that "the defendant agreed that at least two acts of racketeering would be committed in furtherance of the conspiracy." Millán-Machuca, 991 F.3d at 18 (citing Leoner-Aguirre, 939 F.3d at 317).

Thus, Millán-Machuca has not shown that the claimed Giglio or Jencks Act violations give rise to the requisite prejudice. See Nelson-Rodriguez, 319 F.3d at 35; see also United States v. Duval, 496 F.3d 64, 73 (1st Cir. 2007) (noting that the tests for prejudice under Jencks and Giglio are similar). For that reason, we reject this challenge.

**3.**

Millán-Machuca also challenges his convictions based on what he contends is a different Giglio violation. Here, he claims that another key witness, Alex Miguel Cruz-Santos ("Cuquito"), admitted to having misidentified one of Millán-Machuca's co-defendants -- Claudio-Morales, who does not himself bring a similar challenge -- in a certified transcript of a phone call. Millán-Machuca contends, however, that the government failed to meet its obligation to disclose that Cuquito had recanted his prior identification of Claudio-Morales as one of the participants in that call and that the recantation was impeachment material for Giglio purposes. Millán-Machuca thus contends that the District

Court abused its discretion under <u>Giglio</u> in denying his motion to exclude Cuquito's testimony.

The relevant factual background as to this challenge is as follows. In previous trials of other defendants named in the underlying indictment, the government had submitted a certified transcript of a phone call between four alleged members of the conspiracy. The introductory section of that transcript listed Claudio-Morales as one of the participants in the call. The government admitted at Millán-Machuca's trial, however, that, while preparing for this trial, Cuquito notified prosecutors that his prior identification of Claudio-Morales as one of the participants in the phone call was incorrect.

Millán-Machuca contends that, in response to the recantation of the identification, the government deleted Claudio-Morales's name from the introductory section of the certified transcript of the call and produced a new, altered but not recertified transcript in June 2019, which was then submitted at Millán-Machuca's trial. The government, however, did not inform Millán-Machuca of either the alteration or Cuquito's recantation before trial. Rather, Millán-Machuca learned of the recantation once trial was underway when his counsel compared the certified

transcript used in prior trials to the version of the transcript the government produced shortly before the trial began.

The government responds that Claudio-Morales was "eliminated from the list of identified speakers" in the introductory section of the transcript because the cooperating witness clarified that Claudio-Morales was not the fourth speaker in the phone conversation and that a certifying translator "certifies the content" of the phone conversation rather than the identity of the speakers. The government thus contends that, because the transcript did not need to be recertified, it had no obligation to disclose the change to the transcript or to inform Millán-Machuca about the recantation of the identification.

Again, we may assume that Millán-Machuca can show that the government failed to produce potential impeachment evidence, as we conclude that his Giglio challenge fails on prejudice grounds. Cuquito's previously having misidentified Claudio-Morales's voice in a recording does not directly cast doubt on Cuquito's testimony regarding Millán-Machuca or his credibility in general. The impeachment value of Cuquito's erroneous identification of Claudio-Morales's voice is primarily that it provides a reason to doubt only his familiarity with, and therefore his testimony about, a different co-defendant -- Claudio-Morales. And, in fact, Millán-Machuca was able to cross-examine Cuquito

regarding the misidentification.[6]  Moreover, as noted above, the evidence against Millán-Machuca was quite strong and included testimony from several witnesses other than Cuquito as well as other recordings.  See Tucker, 61 F.4th at 207.

Thus, we conclude that Millán-Machuca has not met his burden to show prejudice.  See Nelson-Rodriguez, 319 F.3d at 35; Raymundí-Hernández, 984 F.3d at 160.  So, we reject this challenge as well.

---

[6] Millán-Machuca also claims he was prejudiced by the government's failure to disclose the misidentification before trial because this failure prevented him from effectively challenging the "suggestiveness" of the voice-identification procedure through a pre-trial in limine motion seeking the suppression of "some -- or all -- of the identifications." However, Millán-Machuca made exactly such a motion orally and then in writing to the District Court during trial once the misidentification came out.  After hearing Millán-Machuca's arguments, the District Court denied the motion and allowed the jury to see a transcript that included Cuquito's voice identifications.  On appeal Millán-Machuca does not explain why an earlier disclosure regarding the misidentification would have allowed him to present the issue of suggestiveness more effectively nor does he directly challenge the district court's denial of his motion to suppress the identifications.  See United States v. Devin, 918 F.2d 280, 290 (1st Cir. 1990) ("A defendant who claims that his hand was prematurely forced by delayed disclosure cannot rely on wholly conclusory assertions but must bear the burden of producing, at the very least, a prima facie showing of a plausible strategic option which the delay foreclosed.").  Further Millán-Machuca does not explain why, assuming he could have secured the suppression of Cuquito's other identifications, there is "a reasonable probability that . . . the result of the proceeding would have been different" had the jury not seen those identifications.  Tucker, 61 F.4th at 207.

**4.**

The next disclosure-based challenge that we must address is brought by Rosario-Orangel. He claims, on the basis of an alleged Giglio violation, that the District Court abused its discretion in denying his motion to strike the testimony of one of the government's cooperating witnesses, Miguel Álvarez-Medina. We disagree.

Álvarez-Medina was one of three witnesses who testified that Rosario-Orangel was a ÑETA chapter leader at the Bayamón prison. Rosario-Orangel contends that the government improperly withheld the fact that Álvarez-Medina had admitted, prior to trial, that he had misidentified Rosario-Orangel as another person who shares one of Rosario-Orangel's nicknames ("Cholon") when Álvarez-Medina was shown a picture of Rosario-Orangel during his grand jury testimony. In his grand jury testimony, Álvarez-Medina identified a man named "Cholon Caquias" when he was shown a picture of Rosario-Orangel. But there is no dispute that, in fact, Cholon Caquias was not housed at Bayamón prison, which is the prison at which Rosario-Orangel was accused of holding a leadership role in ÑETA.

A few weeks before trial, after previously refusing to do so, the government produced for the defense both the photograph and Álvarez-Medina's statement before the grand jury. Rosario-Orangel contends that the government's production of this material

failed to disclose either "the fact that the grand jury testimony was not about Rosario but someone else" or the fact that Álvarez-Medina "had recanted his grand jury testimony."

Rosario-Orangel appears to be arguing that the portion of the grand jury testimony that was disclosed did not itself make clear that the misidentification had occurred, because in the disclosed portion of the testimony Álvarez-Medina only refers to a "Cholon," who "was the leader . . . of Main Ponce," and that reference on its face could have referred to Rosario-Orangel. Thus, Rosario-Orangel maintains, he did not realize that the misidentification had occurred or learn of the recantation of the identification until trial.

In that regard, Rosario-Orangel contends that he came to the realization that there had been a misidentification only when Álvarez-Medina admitted during his direct examination by the government that he had "made a mistake" in his grand jury testimony when he "talked about Cholo[n] Caquias" after being shown a picture of Rosario-Orangel. Rosario-Orangel goes on to argue that the withholding of the information not only kept him from learning of the misidentification in advance of trial but also mattered because the withheld information was "highly impeaching" of Álvarez-Medina's "uncorroborated" testimony, which Rosario-Orangel asserts was "essential to [his] conviction." To that last point, Rosario-Orangel argues that the delayed and

incomplete disclosure of the information deprived him of the opportunity to show that "Cholon Caquias" should have been charged in Rosario-Orangel's place. Accordingly, he contends he was prejudiced by the asserted Giglio violation.

Rosario-Orangel failed to raise this Giglio claim at trial however, when, by his own account, the asserted violation first came to light. He also did not raise it in a post-trial Rule 29 or Rule 33 motion. We therefore review this claim only for plain error, which means that Rosario-Orangel must show: "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected [his] substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." United States v. Sanchez-Berrios, 424 F.3d 65, 73 (1st Cir. 2005). Rosario-Orangel has not met his burden to show that his substantial rights or the fairness and integrity of the trial were affected by the government's delayed disclosure.

Rosario-Orangel emphasizes that his chief line of defense was that he had been misidentified as the "Cholon" who other cooperating witnesses testified was a chapter leader for ÑETA. Thus, Rosario-Orangel contends, the claimed Giglio violation was prejudicial because it prevented him from further developing this theory of misidentification. But the record shows that Rosario-Orangel was able to "extensively cross-examine[]"

Álvarez-Medina about this misidentification and to "argue to the jury" that Álvarez-Medina's testimony should be discounted. United States v. Rodríguez-Rivera, 473 F.3d 21, 26 (1st Cir. 2007) (finding defendant failed to carry burden to show prejudice in such a situation).

Rosario-Orangel does assert that he might have "redirected his defense investigation" into the background of Cholon Caquias. Rosario-Orangel then goes on to claim that doing so might have shown "that it was Cholon Caquias who should have been charged, not Rosario." But "[a] defendant who claims that" he was prejudiced "by delayed disclosure cannot rely on wholly conclusory assertions but must bear the burden of producing, at the very least, a prima facie showing of a plausible strategic option which the delay foreclosed." Devin, 918 F.2d at 290. And Rosario-Orangel makes no argument as to why there is a reasonable possibility that Cholon Caquias was actually the person who held a leadership role at Bayamón prison rather than Rosario-Orangel. We thus conclude that Rosario-Orangel has failed to carry his burden on plain error.

## B.

In addition to the Jencks Act, Giglio, and Brady challenges that we have addressed so far, there is still one more disclosure-based challenge to consider. Millán-Machuca asserts on appeal that, given the requirements of Federal Rule of Criminal

Procedure 16, the District Court abused its discretion by denying his motion to compel the government to turn over certain documents that had been created and maintained by the PRDCR and that he alleges were in the government's possession at the time of the pre-trial proceedings. Here, too, we are not persuaded.

The documents at issue include prior interviews of cooperating witnesses in the federal investigation by officials in the PRDCR and other unspecified documents. Before trial, Millán-Machuca was granted an ex parte discovery order for such documents that had been generated and maintained by the PRDCR.

The PRDCR responded to that order by claiming that it could not produce the documents because the FBI had confiscated the originals and that the PRDCR had no copies. Millán-Machuca then requested the documents from the government. The government asserted that it had already handed over all material in its possession that fell within Millán-Machuca's request.

Under Rule 16, "the government must permit the defendant to inspect [documents, photos, and other records] or copies or portions of any of these items, if the item is within the government's possession, custody, or control" and "the item is material to preparing the [defendant's] defense." United States v. Goris, 876 F.3d 40, 44 (1st Cir. 2017) (quoting Fed. R. Crim. P. 16(a)(1)(E)). But, in "order to uphold [the] denial of a request for additional discovery, we do not demand epistemological

certainty that no discoverable information was withheld from the defendant." Id. at 45. And we review the denial of a motion to compel discovery only for an abuse of discretion. United States v. Chan, 981 F.3d 39, 62 (1st Cir. 2020) (citing United States v. Flete-García, 925 F.3d 17, 33 (1st Cir. 2019)).

Millán-Machuca contends that the District Court erred in taking the government at its word that it had disclosed all material that fell within Millán-Machuca's discovery requests for the PRDCR documents. But Millán-Machuca fails to specify on appeal the documents that the government withheld. Nor does he demonstrate (rather than merely speculate) that -- even assuming the relevant interviews of cooperating witnesses and other unspecified documents still existed at all -- the documents in question were likely in the government's possession. We thus see no basis for concluding that there was an abuse of discretion.

## C.

Having resolved the disclosure-based challenges, we now turn to the challenges that concern whether the District Court erred by failing to cure or otherwise address two of the government's arguments to the jury. Only Quiñones-Santiago brings these challenges. Specifically, he takes issue with (1) the government's statement in its closing argument about the role that the "trafficking of cell phones" played in the alleged conspiracies and (2) the government's statements in its closing argument that

he asserts conflated the "enterprise" with the "liable person." There is no merit to either challenge.

## 1.

It is well established that the government may not use "improper methods calculated to produce a wrongful conviction" at trial. United States v. Young, 470 U.S. 1, 7 (1985) (quoting Berger v. United States, 295 U.S. 78, 88 (1935)). Thus, the Supreme Court has explained that the government may neither misstate the law nor mislead the jury in its arguments in a manner that "infect[s] the trial with unfairness as to make the resulting conviction a denial of due process." Sawyer v. Smith, 497 U.S. 227, 235 (1990).

To determine whether an "improper" or misleading statement by the government in its argument to the jury was so prejudicial as to warrant a new trial, we ask whether the statement in the context of the trial "'so poisoned the well that the trial's outcome was likely affected,'" considering "(1) the severity of the misconduct, including whether it was isolated and/or deliberate; (2) whether curative instructions were given; and (3) the strength of the evidence against the defendant." United States v. González-Pérez, 778 F.3d 3, 19 (1st Cir. 2015) (quoting United States v. Rodríguez, 675 F.3d 48, 62 (1st Cir. 2012)); see, e.g., United States v. Freitas, 904 F.3d 11, 24 (1st Cir. 2018). When a defendant timely objects to a comment made by the government

during closing argument (and the government concedes that such is the case here), we review a claim "that the contested comment was improper" de novo.  Freitas, 904 F.3d at 24 (citing Rodríguez, 675 F.3d at 62).

**2.**

We begin with the challenge that pertains to the government's statements to the jury regarding the appellants' trafficking of cellphones into prisons.  Quiñones-Santiago takes aim at the statement by the government during closing arguments that was made in response to the defense's argument that cellphone trafficking "is not a predicate RICO act."  The government argued to the jury in the statement that, "if you engage in cellphone trafficking, you aid and abet, and you conspire to engage in drug trafficking."  Quiñones-Santiago's counsel objected to the statement, and the District Court immediately overruled the objection.

Quiñones-Santiago contends, rightly, that trafficking cellphones is not itself a predicate RICO crime or a federal crime in its own right.  He further contends that the statement is especially concerning because of the emphasis that the government placed on cellphone trafficking throughout his trial.  But we conclude that the statement at issue, when considered in context, merely clarified that the evidence of the cellphone trafficking showed the role that the trafficking of cellphones played within

ÑETA's alleged drug trafficking operation. Thus, when the government argued that cellphone trafficking and drug trafficking went "hand-in-hand" and that defendants who "engage[d] in cellphone trafficking . . . aid[ed] and abet[ted] . . . drug trafficking," we do not understand the government to have been incorrectly suggesting that cellphone trafficking is itself a predicate racketeering activity or a federal crime in its own right. Rather, read in context, the statement by the government was simply contending that the jury could, in finding that the appellants conspired to engage in drug trafficking, consider evidence that they participated in the trafficking of cellphones into the prisons given what the evidence supportably showed about how the enterprise used the trafficked cell phones in its drug trafficking activities. C.f. United States v. Ayala-Garcia, 574 F.3d 5, 18 (1st Cir. 2009) ("Our cases establish that some leeway is appropriate when the government's challenged comments may fairly be seen as a response to comparable remarks by defense counsel.").

Moreover, there is little risk that the statement in question might have led the jury to understand cellphone trafficking to constitute a standalone "racketeering activity." The District Court instructed the jury that "the definition of racketeering acts is limited to a specific list of crimes set by statute," that the racketeering acts charged in the indictment in

- 54 -

this case were "drug trafficking" and "murder," and that "[i]n order to be convicted of conspiracy to commit racketeering, the [g]overnment must prove that the defendants agreed that one or more members [of the] enterprise would commit crimes that qualify as racketeering acts by law and that are specified in the indictment" (emphasis added).

Nor is there any risk that a juror could have thought that cellphone trafficking was, in and of itself, a crime under 21 U.S.C. §§ 846 and 841(a)(1). The instructions the jury received made clear that, to return a guilty verdict on the drug trafficking conspiracy charge, the jury had to find, for each appellant, that he conspired to traffic specific quantities of specific controlled substances.

Quiñones-Santiago does assert that the District Court's instructions only made matters worse by expansively defining related racketeering acts as follows: "Examples of related racketeering acts are acts that benefit the enterprise, that are authorized by the enterprise, or that further or promote the purposes of the enterprise." But, in context, the District Court was explaining that "acts" that otherwise constitute racketeering acts -- ones that "qualify as racketeering acts by law and that [were] specified in the indictment" -- qualify as racketeering acts only when they are intended to "benefit the enterprise," are "authorized by the enterprise," or are undertaken to "further or

promote the purposes of the enterprise." Thus, we are not persuaded that the government's statement, even if improper when read in isolation, "infect[ed] the trial with unfairness as to make the resulting conviction a denial of due process." Sawyer, 497 U.S. at 235.

**3.**

Quiñones-Santiago separately contends that the government's assertedly "misleading use" of the "'enterprise' as the 'liable person'" during the government's closing argument confused the jury. And, he contends, this portion of the government's closing argument prejudiced him by permitting the government to "obtain[] a guilty verdict" on the basis of his association with ÑETA, rather than on the basis of what Quiñones-Santiago himself did.

The statement that Quiñones-Santiago challenges, however, was simply that "the evidence we presented to you throughout this trial showed that La Asociación ÑETA distributed multi-kilogram quantities of heroin, cocaine and marijuana." The government did not suggest to the jury in that statement that the government could prove the appellants' guilt simply on the basis of their membership in ÑETA. And the District Court's jury instructions named each appellant and explained that "the [g]overnment must prove beyond a reasonable doubt" that "the defendants knowingly and willfully agreed to participate in the

- 56 -

conspiracy charged in the indictment," meaning that they agreed to a conspiracy involving a pattern of racketeering activity. Thus, this challenge is without merit.

**D.**

Next, we consider challenges to the jury instructions -- or rather, to jury instructions that were requested but not given. The first of these challenges is brought by Millán-Machuca and Ramos-Baez, who contend that the District Court erred by not giving a jury instruction that they had requested concerning "multiple conspiracies." The second is brought only by Millán-Machuca and pertains to an instruction that he requested that would have stated that mere proximity to, or knowledge of, illegal activities is not a basis for finding guilt. We are not persuaded by either challenge given the instructions that the District Court did provide.

**1.**

Millán-Machuca and Ramos-Baez argue that the District Court erred by refusing to grant their request for an instruction that the jury should consider whether there were narrower conspiracies than the overarching conspiracies charged in the indictment and that acquittal would have been required if the jury found that these appellants had not joined the charged conspiracies even if they had joined other conspiracies. Millán-Machuca and Ramos-Baez contend that such an instruction would have been

- 57 -

particularly appropriate in their cases because the evidence supportably shows that there were only multiple conspiracies -- on both the RICO and drug-trafficking conspiracy counts -- across different prisons and different groups of inmates.

This Court typically applies a three-part test to determine whether it was reversible error to deny a requested instruction. That test requires a determination as to whether the proposed instruction: "(1) [was] substantively correct [as a matter of law]; (2) was not substantially covered in the charge actually delivered to the jury; and (3) concern[ed] an important point in the trial so that the failure to give it seriously impaired the defendant's ability to effectively present a given defense." González-Pérez, 778 F.3d at 15 (quoting United States v. González-Soberal, 109 F.3d 64, 70 (1st Cir. 1997)). "Under the third requirement, 'reversal is not required unless a defendant suffers substantial prejudice.'" Id. (quoting United States v. De La Cruz, 514 F.3d 121, 139 (1st Cir. 2008)).

The government does not dispute that the first and third prongs of the three-part test were satisfied. But the government argues with respect to the second prong of the test that the instruction that the District Court gave substantially covered the requested instruction. We agree.

The District Court instructed the jury as to both the RICO conspiracy and drug-trafficking conspiracy charges that the

government had the burden of proving beyond a reasonable doubt the existence of the specific agreement charged in the indictment "and not some other agreement."  Then, as the government points out, the District Court expressly instructed the jurors -- for each of the conspiracy charges -- that:

> If you find beyond a reasonable doubt that a conspiracy of some kind existed between the defendant and some other person, that, by itself, is not sufficient to find the defendant guilty.
>
> . . . [T]he Government is required to prove, beyond a reasonable doubt, the existence of the conspiracy specified in the indictment.

We thus conclude that the District Court's instructions conveyed the substance of the instruction that the appellants requested: that the appellants must be acquitted if the jury found that they were not members of the charged overarching conspiracies, even if it found that they may have been members of some other conspiracy. See, e.g., United States v. Belanger, 890 F.3d 13, 33 (1st Cir. 2018) (citing United States v. Walker-Couvertier, 860 F.3d 1, 16 (1st Cir. 2017)); see also, e.g., United States v. Si, 343 F.3d 1116, 1126-27 (9th Cir. 2003) (noting that a conspiracy instruction that contains language similar to the language used by the district court obviates the need for further instructions on multiple conspiracies).

## 2.

Millán-Machuca also takes aim at the District Court's refusal to give his requested instruction that the "mere presence at the scene of a crime, or merely knowing that a crime is being committed or is about to be committed, is not sufficient conduct to find the defendant committed that crime." He contends that the instruction would have clarified that, even if Millán-Machuca was aware of drug-trafficking activities, such knowledge would not be sufficient for conviction. Millán-Machuca argues that the requested instruction was particularly warranted here because his defense theory emphasized that his goals as a ÑETA leader "were legitimate and that he made considerable efforts on legitimate pursuits on behalf of inmates [and, thus, something] more than his failure to stop others from engaging in drug-trafficking was required to sustain his conviction."

But the challenge fails because this requested instruction, too, was "substantially covered in the charge actually delivered to the jury." González-Pérez, 778 F.3d at 15. The District Court instructed the jurors that they had to "unanimously agree as to each defendant individually on which type or types of racketeering activity that the defendant agreed the enterprise would conduct" and that they had to find that each defendant "intended to agree and shared a general understanding about the crime." In addition, the District Court instructed the

- 60 -

jurors that "[m]ere association with other persons, even persons involved in criminal activity does not, by itself, establish the existence of a conspiracy." Thus, the instructions made clear that the government had to prove more than either a defendant's mere presence at a place where criminal activity occurred or mere awareness of that criminal activity.

**E.**

We turn, then, to the various evidentiary challenges brought by several of the appellants. We conclude that all but the last of these challenges are without merit.

**1.**

We first address Rosario-Orangel's challenges that pertain to the assertedly erroneous admission of evidence regarding what he refers to as "street point" drug sales. The evidence consists of a transcript of a phone conversation involving himself and a co-defendant, Cynthia González-Landrau ("González-Landrau"), who allegedly worked outside of the prison system.

According to Rosario-Orangel, that evidence was not relevant to any of the charges against him because those charges concerned inside-the-prison drug trafficking. He goes on to contend that the evidence, even if relevant, was unduly prejudicial. Finally, he contends that, in any event, the

admission of the evidence resulted in a constructive amendment to the indictment.  We are not persuaded.

**a.**

Under the Federal Rules of Evidence, "relevant" evidence is any evidence that has a "tendency to make a fact" that is "of consequence in determining the action . . . more or less probable than it would be without the evidence."  Fed. R. Evid. 401. Relevant evidence, though generally "admissible," Fed. R. Evid. 402, must be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issue, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  Because the "duty of weighing the probative value of the . . . evidence against its prejudicial effect rest[s] squarely on the shoulders of the trial judge," United States v. Shea, 159 F.3d 37, 40 (1st Cir. 1998), we will rarely reverse "a district court's . . . judgment concerning the relative weighing of probative value and unfair effect," United States v. Smith, 292 F.3d 90, 99 (1st Cir. 2002).

The phone conversation in question was between Rosario-Orangel and González-Landrau.  It centered on González-Landrau's drug dealing in a nearby housing project.  The conversation did not expressly mention González-Landrau supplying drugs to ÑETA or its members inside the prison.  The conversation

included a discussion, however, between Rosario-Orangel and González-Landrau about the need to set up a meeting with other people who were selling drugs. And that is significant because other evidence at trial tended to show that González-Landrau was known by witnesses to be serving at the time of the phone call as a conduit between ÑETA and the sources from which that entity obtained substances that its members then smuggled into the prisons. We thus agree with the government that the evidence of what was discussed on the phone call between Rosario-Orangel and González-Landrau was relevant, as that evidence tended to show that ÑETA members -- including Rosario-Orangel -- could arrange for the trafficking of drugs even while imprisoned.

We also agree with the government that the District Court did not abuse its discretion in determining that the evidence was not unduly prejudicial. A district court "is not required to scrub the trial clean of all evidence that may have an emotional impact." United States v. Morales-Aldahondo, 524 F.3d 115, 120 (1st Cir. 2008). In addition, the District Court's instructions to the jury emphasized that it could convict the appellants only if it found that the government proved, beyond a reasonable doubt, that they

participated in the conspiracies specifically charged in the indictment.

**b.**

Rosario-Orangel separately contends that the admission of the evidence of the "street point" drug sales -- in particular, the evidence of the phone call between Rosario-Orangel and González-Landrau -- resulted in a constructive amendment to the indictment. Rosario-Orangel is right that he has a "Fifth Amendment right to indictment by a grand jury" and a "Sixth Amendment right to be informed of the crime charged." United States v. McBride, 962 F.3d 25, 32 (1st Cir. 2020); see Sitrone v. United States, 361 U.S. 212, 216-17 (1960). He is also right that this constitutional guarantee precludes the government from amending the charges that were brought against him (i.e., the indictment) after the grand jury issued it against him by, for example, introducing evidence of different crimes that is not directly relevant to the offenses charged in the indictment. United States v. Muñoz-Franco, 487 F.3d 25, 65 (1st Cir. 2007). But, even reviewing de novo, see McBride, 962 F.3d at 31, we reject this challenge because the indictment alleged that ÑETA smuggled drugs into the prisons with the help of civilians inside and

outside the prisons and the evidence at issue bore directly on that charged offense.[7]  See Muñoz-Franco, 487 F.3d at 65.

**2.**

The next evidentiary challenge that we address concerns whether the District Court erred by failing under Federal Rule of Evidence 701 to strike the testimony of Álvarez-Medina, a cooperating witness, about his opinion regarding the meaning of certain terms used in a series of texts found on a phone associated with ÑETA.  This challenge is brought by Rosario-Orangel, who objects specifically to the portion of Álvarez-Medina's testimony in which that cooperating witness testified that he believed one of the participants in the text thread, who was identified only as "Barba," was Rosario-Orangel, who went by that nickname.  Rosario-Orangel also objects to the portion of Álvarez-Medina's testimony in which Álvarez-Medina testified that he believed that "Barba" was referring in that text exchange -- based on "Barba's" use of the code word "ticket" -- to the proceeds of a drug transaction.  Álvarez-Medina further testified that the conversation therefore

---

[7] The government does suggest that Rosario-Orangel's objection below was limited to his claim that the evidence relating to his phone call with González-Landrau was not relevant, unfairly prejudicial, or both and that his claim that the evidence resulted in a constructive amendment to the indictment is therefore subject only to plain error review.  See United States v. Paredes-Rodríguez, 160 F.3d 49, 55 (1st Cir. 1998).  But we need not address that contention because, even assuming de novo review applies, we are not persuaded that the evidence resulted in a constructive amendment to the indictment.

indicated that "Barba" was owed money from the sale of drugs "Barba" had provided.

The parties agree that the testimony by Álvarez-Medina is "properly characterized as lay opinion testimony under Federal Rule of Evidence 701." See United States v. Obiora, 910 F.3d 555, 561 (1st Cir. 2018) (explaining that the "testimony of a member of a drug-trafficking ring interpreting recorded phone calls is lay opinion testimony" (citing United States v. Valbrun, 877 F.3d 440, 443 (1st Cir. 2017))). The question, therefore, is whether the testimony complied with Rule 701, which "allows lay opinion testimony that is '(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.'" Id. at 561-62 (quoting Fed. R. Evid. 701).

With respect to Álvarez-Medina's testimony regarding the meaning of the term "ticket," Rosario-Orangel argues that this testimony was inadmissible as it was not based on the witness's own rational perceptions because Álvarez-Medina denied direct involvement in any of ÑETA's criminal activities. We see no merit to this argument, even assuming that -- contrary to the government's position -- it is preserved.

Álvarez-Medina testified that he was member of ÑETA and served on the Dialogue Committee, a position through which he had

contact with leadership and worked alongside other members who were involved in the drug-trafficking aspect of the enterprise. He further testified to his personal knowledge of ÑETA's criminal activities and internal customs and operations. We thus reject Rosario-Orangel's contention that Álvarez-Medina's testimony about the meaning of the word "ticket" in the context of the conversation was not rationally based on his own perceptions as required by Rule 701. See Obiora, 910 F.3d at 562 ("A lay witness may testify based on personal knowledge to the meaning of words used in a conversation to which he was not a party.").

Rosario-Orangel does also contend that the District Court reversibly erred by failing to strike Álvarez-Medina's testimony identifying the "Barba" in the text conversation. Rosario-Orangel argues that the District Court abused its discretion in not striking this testimony because it was not "helpful" to clearly understanding the witness's testimony.

As Rosario-Orangel points out, the District Court did initially sustain an objection to the government's questioning of Álvarez-Medina about to whom "Barba" referred but then refused to strike Álvarez-Medina's response, which the jury appears to have heard, that "Barba" referred to Rosario-Orangel. In arguing that it was a prejudicial abuse of discretion for the District Court not to strike the testimony and instruct the jury to disregard it, Rosario-Orangel emphasizes that we have held that Rule 701

"requires exclusion where the witness is no better suited than the jury to make the judgment at issue," id. at 562 (emphasis added) (quoting Valbrun, 877 F.3d at 443). And, Rosario-Orangel argues, Álvarez-Medina, who was not a party to the text conversation, was no better suited than the jury to determine the identity of the "Barba" in the text exchange, given that the jury already had heard testimony that one of Rosario-Orangel's nicknames was "Barba."

"We will find non-constitutional evidentiary errors harmless where it is 'highly probable that the errors did not influence the verdict.'" United States v. Sanabria, 645 F.3d 505, 516 (1st Cir. 2011) (quoting United States v. Meises, 645 F.3d 5, 23 (1st Cir. 2011)). And, while the government bears the burden of showing harmlessness, the requisite "case-specific inquiry" into factors including "the centrality of the tainted evidence, its uniqueness, its prejudicial impact, the use to which the evidence was put, and the relative strengths of the parties' cases[,]" United States v. Garcia-Morales, 382 F.3d 12, 17 (1st Cir. 2004), leads us to conclude that any error here was harmless.

Prior to the testimony by Álvarez-Medina regarding the text thread, he had testified that Rosario-Orangel went by the name "Barba." Álvarez-Medina had also testified by that time, without objection, that he was aware of no other person going by the nickname "Barba" in the Bayamón prison where both he and Rosario-Orangel were housed and where the cellphone containing the

text conversation was found.  Thus, there was a solid basis, apart from the testimony that is the target of the challenge, on which the jury could rely to infer that Rosario-Orangel was the "Barba" in the text conversation.  Indeed, as the District Court itself stated when it initially sustained Rosario-Orangel's objection to the identification, given the testimony that the jury had already heard, "they know who Barba is . . . that speaks for itself."

Moreover, the case against Rosario-Orangel did not depend centrally on the text conversation at issue.  The evidence against Rosario-Orangel also included a wiretapped phone conversation between him and one of the enterprise's outside drug suppliers and the testimony of three other cooperating witnesses who testified about his participation in the enterprise.  Thus, we conclude that the government has carried its burden to show that it is highly probable that the jury's verdict convicting Rosario-Orangel was not influenced by any potential error in not striking Álvarez-Medina's testimony that Rosario-Orangel was the "Barba" in the text conversation.  See Sanabria, 645 F.3d at 516.

### 3.

We come, then, to the final evidentiary challenge.  It concerns whether the District Court complied with the requirements of Petrozziello and is brought by Millán-Machuca, Rosario-Orangel, and Quiñones-Santiago.  These three appellants take aim at the admission of certain statements at trial that were made by non-

testifying alleged coconspirators on the ground that such statements were inadmissible hearsay. For the reasons that we will next explain, we conclude that this challenge requires a limited remand to the District Court.

**a.**

The Federal Rules of Evidence define "hearsay" as an out-of-court "statement" that "a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). The admission of such statements into evidence is barred unless "a federal statute," the Federal Rules of Evidence, or "other rules prescribed by the Supreme Court" provide otherwise. Fed. R. Evid. 802.

Under Rule 801(d)(2)(E), evidence of an out-of-court statement that was "made by [a defendant]'s coconspirator during and in furtherance of the conspiracy" does not qualify as "hearsay." Such a statement thus does not fall within Rule 802's bar on the admission of hearsay, see United States v. Ford, 839 F.3d 94, 105-06 (1st Cir. 2016) (citing Petrozziello, 548 F.2d 20), and so may be considered for the truth of the matter asserted in that statement, see United States v. Colón-Díaz, 521 F.3d 29, 35 (1st Cir. 2008).

In this Circuit, a statement may be admitted for the truth of the matter asserted under Rule 801(d)(2)(E) if it satisfies the requirements set forth in Petrozziello. See United

States v. Ciresi, 697 F.3d 19, 25 (1st Cir. 2012); United States v. Sepulveda, 15 F.3d 1161, 1180 (1st Cir. 1993). Petrozziello requires that the party seeking admission of a statement as a co-conspirator statement must establish by a preponderance of the evidence that the declarant and the defendant were members of the same conspiracy at the time that the statement was made and that the statement was made "in furtherance" of the conspiracy. That showing may be made, moreover, only if there is corroboration in the form of extrinsic evidence beyond the statement itself of the declarant's involvement in the conspiracy. Ciresi, 697 F.3d at 25.

To operationalize Petrozziello's requirements, we have "constructed a model for the handling of evidence proffered under Rule 801(d)(2)(E)." United States v. Bradshaw, 281 F.3d 278, 283 (1st Cir. 2002) (citing United States v. Ciampaglia, 628 F.2d 632, 638 (1st Cir. 1980)). Under that model, the trial court may conditionally admit the alleged coconspirator statements at the time that they are offered, id., but then must, at the close of all the evidence, "assess . . . whether the government has met its burden for admitting statements under Rule 801(d)(2)(E)," United States v. Avilés-Colón, 536 F.3d 1, 14 n.11 (1st Cir. 2008).

"If the court ultimately concludes that the provisionally admitted evidence does not satisfy the applicable standard" set forth above, "it must give a cautionary instruction

to the jury, or, upon an appropriate motion, declare a mistrial if the instruction will not suffice to cure any prejudice." Bradshaw, 281 F.3d at 283 (citation omitted).  For a defendant properly to preserve a challenge to the admission of evidence on Petrozziello grounds, the defendant "must ordinarily object both when the hearsay statements are provisionally admitted and again at the close of all the evidence." Avilés-Colón, 536 F.3d at 14 (citation omitted); see Ford, 839 F.3d at 106.

**b.**

The path to the Petrozziello challenges at issue here coming our way is a winding one.  But it is critical to describe that path in some detail in order to assess the merits of these challenges.

Millán-Machuca, Rosario-Orangel, and Quiñones-Santiago each lodged "hearsay" objections during trial to various statements made by alleged coconspirators.  In at least some of those objections, the appellants expressly noted a "Petrozziello" issue.

The District Court permitted the statements to be admitted.  But the District Court did not, at that time, rule on whether any of the statements were admissible under Petrozziello such that they could be considered by the jury.  Accordingly, at the close of evidence, the government reminded the District Court

that it needed to make a <u>Petrozziello</u> ruling under Rule 801(d)(2)(E).

In response to the government's prompt, the District Court asked if any party wanted "to be heard" on the matter. Counsel for Quiñones-Santiago noted that he would be addressing the issue in his Rule 29 motion, but the parties otherwise did not respond to the question. The record shows that the District Court then immediately began tending to a separate issue.

Quiñones-Santiago did point out in his motion for acquittal pursuant to Federal Rule of Criminal Procedure 29 that the District Court had yet to determine whether some hearsay statements in the record were in fact made in furtherance of the charged conspiracy and thus were for that reason admissible under <u>Petrozziello</u>. The Rule 29 motion was denied without reference to the issue. The <u>Petrozziello</u> issue does not appear to otherwise have come back up again before the District Court.

**c.**

The parties agree that the District Court did not make the required <u>Petrozziello</u> ruling with respect to statements that were brought in under Rule 801(d)(2)(E). The government argues in its brief, however, that the appellants cannot claim any entitlement to relief now for that failure because they affirmatively waived the <u>Petrozziello</u>-based challenge to the admission of those statements by failing to respond to the District

Court's invitation to be "heard" on the matter at the close of evidence.

The government is right that the <u>Petrozziello</u> challenge being advanced to us would have to be rejected if the appellants affirmatively waived this challenge below. <u>United States</u> v. <u>Padilla-Galarza</u>, 990 F.3d 60, 74 (1st Cir. 2021) (noting that issues initially raised at trial can later be waived at trial); <u>United States</u> v. <u>Simon</u>, 12 F.4th 1, 60 (1st Cir. 2021) (explaining that the "defense's silence" may demonstrate waiver if the silence is "reasonably understood <u>only as</u> signifying agreement that there was nothing objectionable" (emphasis added) (citation omitted)). But, in our view, especially because the government bears the burden of showing that the hearsay in question is admissible, the record is best read to show that there was no waiver.

As the appellants bringing the challenge contend, the record most naturally suggests that they understood that they had already been heard by making the relevant hearsay objections. Thus, we agree with these appellants that the record supports their contention that, because the request for the <u>Petrozziello</u> determination had been made by one of the parties at the close of the evidence, they did not understand that they needed to be heard further to preserve their objection. Nor is there any indication in the record that the District Court determined that it did not need to make a <u>Petrozziello</u> finding because it understood the

appellants to have waived or withdrawn their objections to the testimony. Thus, we see no reason on this record to conclude that the appellants affirmatively waived their right to challenge the admissibility of the statements under Petrozziello by not affirmatively asserting that challenge at the moment in question.

We note, too, that the government appears to acknowledge in its post-argument Fed. R. App. P. 28(j) letter that we have previously addressed situations in which a defendant's counsel objected to "at least some of the [alleged] coconspirators' statements" at trial but "did not request a final Petrozziello determination." See United States v. Machor, 879 F.2d 945, 950 (1st Cir. 1989). In a passage from Machor that is worth quoting at length here, we explained:

> On the one hand we have stressed the importance of making a formal Petrozziello finding. This ensures that the court addresses the policy concerns inherent in considering the admissibility of extrajudicial statements. On the other hand, an "automatic reversal" rule would encourage litigants, in some cases where the evidence supports the admissibility of the extra-judicial statements, to strategically omit a specific Petrozziello request in order to get an "automatic" reversal. Thus, the responsibility to see that a Petrozziello determination is made should fall on both the government and the defense. In cases, such as this one, where a proper hearsay objection was made and a Petrozziello determination was neither requested by the parties nor made by the trial court, there will be no reversible error if an examination of the record reveals that the trial court acknowledged that a Fed.

R. Evid. 801(d)(2)(E) problem existed and considered the issue, provided, of course, that the government has met its burden of proof under Petrozziello.

Id. at 950-51 (citations omitted). We then continued: "If the appeals court cannot determine whether the preponderance standard has been met, or feels that the trial court did not properly consider the issue, it may also remand to the trial court with instructions to make a Petrozziello determination." Id. at 951 (explaining that such an "approach will ensure that the policies inherent in making a Petrozziello determination are considered and that judicial resources are conserved" (citing United States v. Holloway, 731 F.2d 378 (6th Cir. 1984))).

Here, the record is clear that the District Court "acknowledged" that a Petrozziello "problem" existed. When the issue first arose during trial as a result of Quiñones-Santiago's objection, for example, the District Court responded by noting that it expected the government to explain why the statement was made during and in furtherance of the conspiracy. At another point, as noted, the government conceded during a colloquy that it was relying on Rule 801(d)(2)(E) to bring in "a lot" of its evidence at trial. Then, at the close of the evidence, the government itself reminded the District Court of its need to make a Petrozziello ruling, and the District Court asked for further

input from the parties.  Yet, no determination was made.  So, Machor accords with our conclusion that there was no waiver.[8]

To be sure, under Machor, and in light of what transpired below, we could deem the absence of any of the necessary Petrozziello findings harmless if the record reveals that the government did satisfy its burden of showing by a preponderance of the evidence that the challenged statements were made during and in furtherance of the conspiracy.  See 879 F.2d at 951.  But the government does not make any case on appeal that, based on the extrinsic evidence on which it was relying, the objected-to hearsay statements were made during and in furtherance of the conspiracy and thus were in fact admissible.  And, it is not apparent to us from the record whether the government did satisfy its burden to establish by a preponderance of the evidence that the statements that were objected to at trial on hearsay grounds were made in furtherance of the conspiracy.  See id.

---

[8] The government argued in a Fed. R. App. P. 28(j) letter, which was offered in response to questioning at oral argument, that -- even if we were to "disagree[] with [its] waiver argument" -- we should review the Petrozziello claim for "plain error."  And, the government contends, we should affirm under plain error because there is "overwhelming evidence" in the trial record that the Rule 801(d)(2)(E) statements were made "during and in furtherance" of the same conspiracy of which the defendants were members.  We reject this argument too, because the same portions of the record that lead us to conclude there was no affirmative waiver also lead us to conclude there was no forfeiture.

For example, while one of the alleged coconspirators, Cuquito, was permitted to testify as to what he was told by various other ÑETA members about the history and structure of ÑETA and its activities, it is unclear what collection of testimony or other evidence was presented that bears on the preponderance analysis as to whether the statements Cuquito testified about were made in furtherance of the conspiracy. The same is true of testimony by another alleged coconspirator, José González-Gerena ("Perpetua"). Perpetua testified that an inmate named "Jowy" told him that he (Jowy) obtained the drugs that he sold from the maximum leadership, including Millán-Machuca. But, here again, the record does not reveal what evidence the government was relying on to show that the statement by "Jowy" was made in furtherance of the charged conspiracies. And, finally, Ruiz-Acevedo testified about what he learned from various other ÑETA members about the quantities of drugs sold at different Puerto Rico prison facilities. Yet, it is again unclear from the record what evidence demonstrates that these statements satisfy the <u>Petrozziello</u> rule.

In sum, we "cannot determine whether the preponderance standard has been met" based on our own examination of the record as it now stands. <u>Machor</u>, 879 F.2d at 951. We therefore remand the issue to the District Court to make, in the first instance, <u>Petrozziello</u> determinations as to the hearsay evidence that Millán-Machuca, Rosario-Orangel, and Quiñones-Santiago claim was

inadmissible under our Petrozziello rule. See Holloway, 731 F.2d at 382. We do not, however, opine on the merits of that determination.

**F.**

There is one coda. We are aware that one of the appellants who brings the Petrozziello challenge, Millán-Machuca, also brings a cumulative-error challenge. See United States v. Perez-Montanez, 202 F.3d 434, 439-41 (1st Cir. 2000). Specifically, Millán-Machuca argues that even if he was not prejudiced by any of the individual errors that he raises, collectively these errors did substantially prejudice his defense and so warrant reversal of his convictions. While we see no basis for crediting this contention at this juncture, our conclusion on this score is without prejudice to Millán-Machuca renewing this cumulative-error argument following the resolution of his Petrozziello claims on remand, given that we have resolved some of his disclosure-based challenges solely on prejudice grounds.[9]

---

[9] We note that Quiñones-Santiago, who also brings this Petrozziello challenge, asserts cumulative error in his own right in a one-sentence footnote in his opening brief. But, even assuming the claim is not waived for lack of development, we see no merit to it because we "find no error in the various [other] rulings" Quiñones-Santiago challenges, and thus, "there is no cumulative effect to consider," even assuming his Petrozziello claims fail only on prejudice grounds. Perez-Montanez, 202 F.3d at 440-41.

**V.**

There remains to be addressed only the appellants' sentencing challenges. Two appellants -- Rosario-Orangel and Quiñones-Santiago -- assert that the sentences that the District Court imposed on them were procedurally unreasonable. Although we remand on the Petrozziello issue, in the event Rosario-Orangel and Quiñones-Santiago's convictions ultimately stand, it serves the interests of judicial economy for us to address their sentencing challenges here. For the reasons given below, we conclude that the sentences the District Court imposed were not procedurally unreasonable.

**A.**

First, Rosario-Orangel contends that his sentence was procedurally unreasonable because the District Court failed to give him credit for time that he had served for "relevant conduct." We review a preserved challenge to the procedural reasonableness of a sentence for abuse of discretion. United States v. Rivera-Berríos, 968 F.3d 130, 133-134 (1st Cir. 2020). We see no abuse here.

The United States Sentencing Guidelines provide that when "a term of imprisonment resulted from another offense that is relevant conduct . . . the court shall adjust the sentence for any period of imprisonment already served on the undischarged term of imprisonment." U.S.S.G. § 5G1.3(b)(1) (emphases added).

Rosario-Orangel argues on appeal that he should have been credited for time served on a 2010 conviction for possession of controlled substances in violation of Puerto Rico law, which he asserts relates to the federal convictions at issue here.

But the District Court did not err by failing to give Rosario-Orangel credit based on § 5G1.3(b)(1) because Rosario-Orangel had not yet served any time for the 2010 conviction. As the government points out, he is currently serving his nearly thirty-year prison sentence in a Puerto Rico prison for a 1999 conviction for second-degree murder and weapons charges. Rosario-Orangel's later 2010 Puerto Rico drug conviction was ordered to be served "consecutively" to his 1999 murder convictions. Thus, because Rosario-Orangel will not begin serving any part of his sentence for the assertedly "relevant" Puerto Rico drug conviction until he finishes serving his sentence for his 1999 conviction, we see no reason why § 5G1.3(b)(1) would have any applicability to the sentence imposed here.

## B.

Next, Rosario-Orangel and Quiñones-Santiago assert that, under 18 U.S.C. § 3585(b), the District Court "inten[ded]" to credit against their federal sentences time they served in federal custody prior to sentencing in this case. But, they contend, the District Court erred by failing to include a "net sentence" in the judgments that reflected that intention.

- 81 -

The Supreme Court has held, however, that "§ 3585(b) does not authorize a district court to compute the credit at sentencing" and that "the Attorney General must . . . compute the credit under § 3585(b)." United States v. Wilson, 503 U.S. 329, 334-35 (1992); see also Espinoza v. Sabol, 558 F.3d 83, 87 (1st Cir. 2009) ("18 U.S.C. § 3585(b) specifies that a defendant convicted of a federal crime has a right to receive credit for certain time spent in official detention before his sentence begins. That credit is determined by the Attorney General, not by a court."). We therefore see no procedural unreasonableness in either Rosario-Orangel's or Quiñones-Santiago's sentences on the grounds they advance.

## VI.

We retain jurisdiction over docket numbers 20-1275, 20-1276, and 20-1283 and we **remand** these cases for further proceedings consistent with the foregoing opinion. We otherwise **affirm**.